IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
Southern Division

FREDDIE GARLAND, individually and on
behalf of all others similarly situated,

      Plaintiff,

v.

ORLANS PC, et al.,

      Defendants.

Case No. 2:18-cv-11561

Hon. Denise Page Hood

Exec. Mag. Judge R. Steven Whalen

_____/

Andrew J. McGuinness (P42074)
ANDREW J. MCGUINNESS, ESQ.
122 S Main St, Suite 118
P O Box 7711
Ann Arbor, MI 48107
Phone: (734) 274-9374
drewmcg@topclasslaw.com

Samuel G. Firebaugh (P34276)
FIREBAUGH & ANDREWS PLLC
38545 Ford Rd, Ste 104
Westland, MI 48185
Phone: (734) 722-2999
samuelgfirebaugh@hotmail.com

*Counsel for Plaintiff and the Proposed Class*

I. W. Winsten (P30528)
Bruce L. Segal (P36703)
HONIGMAN MILLER SCHWARTZ AND
COHN LLP
660 Woodward Avenue, Suite 2290
Detroit, MI 48226
Phone: (313) 465-7608
iwinsten@honigman.com
bsegal@honigman.com

*Attorneys for Defendants*

_____/

# PLAINTIFF'S MOTION TO STRIKE PORTIONS OF DEFENDANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS, AND BRIEF IN SUPPORT

Plaintiff Freddie Garland, through his attorneys, respectfully requests that this Court strike the portions of Defendants' recently-filed Supplemental Brief in Support of Motion to Dismiss (ECF #29), including Exhibit 1 thereto, as detailed below. In support of this Motion, Plaintiff states:

1.     On April 9, 2019, this Court entered its Stipulated Oder Lifting Stay and Establishing Supplemental Briefing Schedule. (ECF # 28; Exhibit A, attached.)

2.     In that order, this Court authorized Defendants to file a supplemental brief solely "to address the impact on the motion [to dismiss] of the *Obduskey* decision."

3.     The purpose of this scope language in the Stipulated Order was to prohibit the parties from re-briefing arguments that were not addressed in or impacted by *Obduskey*. *See* Exhibit B, attached (email chain among counsel regarding the text of the proposed Stipulated Order).

4.     In contravention of this Court's order, on April 24[t,] 2019, Defendants filed a supplemental brief containing extensive argument and an exhibit that have nothing to do with the impact of the *Obduskey* decision on the pending motion to dismiss.

5.     In order to adhere to this Court's supplemental briefing order in their own upcoming Supplemental Response, and to avoid prejudice that would otherwise result from Defendants' misconduct, Plaintiff asks this Court to strike those portions of Defendants' Supplemental Brief that do not actually address the impact of *Obduskey*.

6.     Plaintiff relies upon the accompanying Brief in Support of Plaintiff's Second Motion to Strike.

7.     Pursuant to Local Rule 7.1(a), counsel for movant initiated a conference with opposing counsel and requested but did not obtain concurrence in the relief sought.

WHEREFORE, Plaintiff respectfully asks that this Court enter an order:

(1)   Striking those portions of Defendants' Supplemental Brief, ECF #29, as indicated in Exhibit C, attached (including Exhibit 1 thereto);

(2)   Awarding monetary sanctions of $1,000 to Plaintiff's counsel to offset the time and effort necessary to file this Motion; and

(3)   Granting such other and further relief as the Court deems just.

Dated: April 29, 2019

Respectfully submitted,

Andrew J. McGuinness (P42074)
ANDREW J. McGUINNESS, ESQ.
122 S Main St, Suite 118
P O Box 7711
Ann Arbor, MI  48107
Phone: (734) 274-9374
drewmcg@topclasslaw.com

Samuel G. Firebaugh (P34276)
FIREBAUGH & ANDREWS PLLC
38545 Ford Rd, Ste 104
Westland, MI  48185
Phone: (734) 722-2999
samuelgfirebaugh@hotmail.com

*Counsel for Plaintiff and the Proposed Class*

**BRIEF IN SUPPORT OF PLAINTIFF'S SECOND MOTION TO STRIKE**

CONCISE STATEMENT OF ISSUE PRESENTED

**Issue 1**:     Should this Court should strike those portions of Defendants' Supplemental Brief In Support of Motion to Dismiss, ECF #29, that exceed the scope of additional briefing authorized by this Court's Stipulated Order for Supplemental Briefing?

Plaintiff answers:  Yes.

## Controlling or Most Appropriate Authority

Federal Rules of Civil Procedure 16, 26 & 83

Local Rule 7.1

*Garland v. Orlans PC*, Case No. 2:18-cv-11561-DPH, Stipulated Order Lifting the Stay and Establishing Supplemental Briefing Schedule (April 9, 2019) (ECF #28)

*Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991)

*Kistner v. Law Offices of Michael Margelesfsky, LLC,* 518 F.2d 433 (2008)

*Martin v. Trott Law, P.C.,* 198 F. Supp. 3d 794 (E.D. Mich. 2016)

*Obduskey v. Wells Fargo*, 879 F.3d 1216 (10th Cir. 2018)

*Obduskey v. McCarthy & Holthus LLP*, 139 S. Ct. 1029 (2019)

## Introduction

This Court stayed this action after the parties had fully briefed Defendants' long-pending motion to dismiss. It did so for a single reason: because the anticipated Supreme Court ruling in *Obduskey v. McCarthy & Holthus LLP*, 139 S. Ct. 1029 (2019) ("*Obduskey*"), might impact the Court's evaluation of that motion. Immediately after the *Obduskey* ruling, counsel for Plaintiff contacted counsel for Defendants and suggested that the parties stipulate to limited supplemental briefing in order to address the *Obduskey* ruling.

After negotiations, this Court entered a stipulated supplemental briefing order that expressly limits briefs to addressing the impact of the *Obduskey* ruling. (ECF #28; Exh. A, attached.) Specifically, the supplemental briefing Order provides:

> Defendants shall file on April 24, 2019, a Supplemental Brief in Support of their pending Motion to Dismiss ***to address the impact on the motion of the Obduskey decision***, which Supplement shall be no more than 15 pages.

(*Id.*, Pg ID 1872; emphasis added.) This language was inserted into the stipulated order by counsel for Plaintiff in order to address his concern that Defendants would attempt to use their two supplemental briefs to elaborate or broaden their previously-briefed arguments on points not addressed by the Court's ruling in *Obduskey*. March 29, 2919, 8:06 a.m. email from Andrew J. McGuinness to Bruce L. Segal  ("[Plaintiff]  rejects your striking of the language that makes explicit that

1

the purpose of the supplemental briefing is to address *Obduskey* (e.g., not an invitation to re-argue issues that have already been the subject of prior briefing and not affected by the *Obduskey* decision"). (Exh. B, attached.)

Class counsel's concerns were well founded; this is precisely what Defendants have done. Indeed, Defendants have gone farther even than could have been imagined, attaching a resume and report of an "expert" having nothing whatever to do with the *Obduskey* ruling. A full 40% of Defendant's supplemental argument focuses on issues not addressed, directly or indirectly, by *Obduskey*. Most of that improper argument (and the new Exhibit 1) attempts to demonstrate that this Court lacks original jurisdiction (or, more accurately, should decline to exercise its original jurisdiction) over the state RCPA claims under the Class Action Fairness Act (CAFA). That was a topic that had been previously briefed; it is in no respect one that is even remotely addressed or impacted by *Obduskey*.

So, Defendants have reneged on their stipulated agreement and disobeyed the plain terms of this Court's supplemental briefing order in an attempt unfairly to improve their position. Plaintiff's instead chose to (indeed, are bound to) do the right thing: adhere to this Court's supplemental briefing order. In the instant Motion, Plaintiff seeks this Court's assistance to avoid prejudice to Plaintiff for adhering to that order. The Court should strike those portions of ECF #29 as shown in Exhibit C, attached. To do otherwise would be to encourage further disobedience

or sharp practice.

## Background

<u>Nature of This Action</u>

This case is an "attorney letterhead" case. *See Kistner v. Margelefsky, LLC, and Michael P Margelefsky,* 518 F.3d 433 (6th Cir. 2008).[1] It challenges as "misleading" a letter sent to Plaintiff on Orlans PC letterhead that expressly or impliedly suggests that an attorney, exercising his or her professional judgment as such, had conducted a "meaningful review" of the matter and had "meaningful involvement" in the sending of the letter. *See Kistner*, 518 F.3d at 439-441*; Avila v. Rubin*, 84 F.3d 222 (7th Cir. 1996).

The Complaint here alleges that non-attorney "processors," instead of attorneys, sent the foreclosure letters to Freddie Garland and to the putative class, and that any attorney review was at most "ministerial." (Cmplt. ¶¶ 57 & 59.) *See Martin v. Trott Law PC,* 198 F. Supp. 3d 794, 804-05 (denying motion to dismiss attorney letterhead claims founded on similar allegations).

The Complaint alleges three bases for this Court's jurisdiction over this action:

(i)     federal question jurisdiction, based upon alleged violations of the Fair Debt Collection Practices Act (FDCPA);

(ii)    CAFA original jurisdiction of Plaintiff's parallel claims under the

---

[1] *Kistner* was unaffected by *Obduskey* and remains good law.

3

Michigan Regulation of Collection Practices Act (RCPA); and

(iii)    independently of CAFA, supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

(Cmplt. ¶¶ 9-10.)

Defendants' Motion to Dismiss

There is no question that this Court has jurisdiction over the FDCPA claims in this action. Defendants' Motion to Dismiss does not contend otherwise. Indeed, Defendants have never argued otherwise.

Defendants' Rule 12(b)(1) & (6) Motion to Dismiss seeks the dismissal of this action. To this end, Defendants contended in their opening briefs that:

1)    The Complaint fails to state a FDCPA claim. This was the Defendants' last argument, at pages 22-25 of their Brief in Support (ECF #7, Pg ID 80-83)[2];

2)    That even if it does state a FDCPA claim, the Complaint's allegations fail to establish CAFA jurisdiction over the state law claims (*Id*., Pg ID 67-69)[3]; and

3)    That if there is no CAFA jurisdiction, this Court should decline to exercise its supplemental jurisdiction of the parallel RCPA claims under 28 U.S.C. § 1367. (*Id*., Pg ID 69-78).[4]

---

[2] Defendants designated this as Issue 3 on their Concise Statement of Issues Presented, ECF #7, Pg ID 55.

[3] Defendants designated this as Issue 1.A in their Concise Statement of Issues Presented, *Id*. at Pg ID 54.

[4] Defendants designated this as Issue 1.B in their Concise Statement, *ibid*. Defendants also argued that the Complaint fails to state a claim under the RCPA. Because they have not attempted to elaborate that argument in their Supplemental Brief, that contention is not relevant to the instant motion.

The parties completed briefing of these arguments last September. *See* ECF #19 (Sept. 19, 2018, Defendants' Reply Brief in Support).

<u>*Obduskey*</u>

In *Obduskey v. Wells Fargo*, 879 F.3d 1216 (10th Cir. 2018), the Tenth Circuit held that a foreclosure law firm whose communications did no more than execute the steps necessary to foreclose under a state's non-judicial foreclosure statute was not (with limited exception) a "debt collector" as defined in the FDCPA, and therefore not subject to most of its proscriptions. This holding added to a circuit split. Other circuits, such as the Sixth Circuit in *Glazer v. Chase Home Finance LLC*, 704 F.3d 453 (2013), had held the all foreclosures, judicial and non-judicial, were by their very nature "debt collection" under the FDCPA.

*Obduskey* was not a class action. Accordingly, the Tenth Circuit had no occasion to address CAFA. And while there were state law claims in *Obduskey*, the Tenth Circuit affirmed their dismissal on the merits, not jurisdictional grounds. So supplemental jurisdiction was not an issue, either. *Id*. at 1223-24.

The Supreme Court granted *certiorari* solely on the FDCPA issue that had generated the circuit split, and accordingly did not address (or even mention) *any*

jurisdictional or state substantive law issues.[5] The Supreme Court affirmed the Tenth Circuit's FDCPA holding in a unanimous ruling on narrow grounds. 139 S. Ct. 1029 (2019). While Plaintiff will develop this point in his upcoming Supplemental Response, the relevant observation for present purposes is that the Supreme Court's overruling of *Glazer* gave Defendants a single new argument in support of contention No. 1 on the above list, i.e., that the Complaint fails to state a FDCPA claim under 15 U.S.C. § 1692e because Defendants are not "debt collectors." Accordingly, Plaintiff does not seek to strike Defendants' supplemental arguments I.A & I.B (ECF #29, Pg ID 5-8), which address this issue.

Because *certiorari* was not sought or granted in *Obduskey* as to the state law claims, and because there was no jurisdictional challenge whatsoever in that case, the Supreme Court's ruling has nothing to say about jurisdiction, much less supplemental jurisdiction. And because *Obduskey* was not a class action, CAFA was never mentioned in the Court's ruling.

Defendants Disregard Their Stipulation and This Court's Order

Defendants' supplemental arguments II.A, II.B & II.C, and Exhibit 1, each focus on application of CAFA to this case. (ECF #29, Pg ID 8-12 & Exh. 1.) These

---

[5] *See* Exhibit D, attached, from the Court's website: https://www.supremecourt.gov/search.aspx?filename=/docket/docketfiles/html/public/17-1307.html .

are bald attempts to elaborate or expand fully briefed points that having nothing to do with the *Obduskey* ruling in direct contravention of the stipulated order. They should be stricken in their entirety.

Defendants' supplemental argument II.D is a closer call, but steps over the line by re-arguing Contention No. 3 in the above list (supplemental jurisdiction)—to which Defendants already devoted approximately ten pages of their opening briefs. It is a camouflaged re-hash of Defendants' supplemental jurisdiction argument. However, because it at least *attempts* to articulate how the *Obduskey* ruling should weigh on this Court's exercise of discretion under 28 U.S.C. § 1367, Plaintiff is content to rebut it in his Supplemental Response.

## Argument

I.   DEFENDANTS' SUPPLEMENTAL BRIEF VIOLATES THIS
     COURT'S STIPULATED SUPPLEMENTAL BRIEFNG ORDER.

### A. The Stipulated Order Expressly Limits the Scope of Supplemental Briefs to Addressing the Impact of the *Obduskey* Ruling.

As should be unnecessary to point out, this Court's scheduling orders are binding upon the parties. Fed. R. Civ. P. 83(b) ("A judge may regulate practice in any manner consistent with federal law . . . and the district's local rules."); Local Rule 7.1(d)(1)(A) ("Unless the court permits otherwise, each motion and response to a motion must be accompanied *by a single brief*.") (emphasis added). *See also, generally,* Fed. R. Civ. P. 16 (authorizing pre-trial orders); Local Rule 7(1)(a)

(authorizing stipulated orders). This Court also has inherent authority to manage its docket, including sanctioning bad faith conduct. *Chambers v. NASCO, Inc.,* 501 U.S. 32, 45-46 (1991) ("[A] court may assess attorney's fees when a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'. . . [including] by delaying or disrupting the litigation or by hampering enforcement of a court order.' The imposition of sanctions in this instance transcends a court's equitable power concerning relations between the parties and reaches a court's inherent power to police itself, thus serving the dual purpose of 'vindicating judicial authority without resort to the more drastic sanctions available for contempt of court and making the prevailing party whole for expenses caused by his opponent's obstinacy.'" (citations omitted)).

The language of this Court's Stipulated Order, Exhibit A, attached, is plain: the authorized supplemental briefs are limited in scope "to address[ing] the impact on the motion [to dismiss] of the *Obduskey* decision." (ECF #28, Pg ID 1872.) Moreover, the negotiation context of the Stipulated Order demonstrates that there can be no confusion about the limiting purpose of this scope language. After *counsel for Defendants attempted to strike this same text limiting* the scope of supplemental briefs to addressing the impact of *Obduskey*, counsel for Plaintiff *rejected* that effort, specifically to emphasize the limitation:

Bruce: Attached please find my revised edit of a draft stipulated order,

which accepts the changes upon which we tentatively agree (including your request for 14 days to file your Supplemental Reply), *but rejects your striking of the language that makes explicit that the purpose of the supplemental briefing is to address Obduskey (e.g., not an invitation to re-argue issues that have already been the subject of prior briefing and not affected by the Obduskey decision).*

If this draft is acceptable to your clients, you have my permission to sign my name and file with the court via its ECF utility today. If this is not acceptable, please promptly advise so that plaintiff can get a motion filed today.

Thanks, Drew.

March 29, 2019, 8:09 a.m., email from attorney McGuinness to attorneys Segal &: Winsten (emphasis added).  (Exh. B, attached.) Later that morning, Mr. Segal responded that he had "confirmed that the [McGuinness revised draft] attached is acceptable to Bill [Winsten]," and authorized its submission. *Id.*

## B. Defendants' Supplemental Brief Violates the Express Limitations of the Supplemental Briefing Order.

Having expressly consented to the supplemental briefing scope limitation, and entry of an order reflecting same, Defendants proceeded to violate it. As set forth above, *Obduskey* has nothing to do with (i) CAFA, or (ii) this Court's original jurisdiction. Instead, the Supreme Court limited its ruling to the scope of the issue certified: whether law firms whose communications do nothing more than implement non-judicial foreclosures as required under state law are on that basis "debt collectors," except for the limited purposes of 15 U.S.C. § 1692f(6).

Defendants' Supplemental Brief contains ten pages of argument. (ECF #29, Pg ID 1881-1891.) Defendants spend approximately forty percent of this total, four pages, re-arguing CAFA original jurisdiction—an issue that had not only already been fully briefed, but was never mentioned, directly or indirectly, by either the Tenth Circuit or the Supreme Court in *Obduskey*. (*Id.*, Pg ID 1884-1888, comprising Arguments II.A-II.C.) Even more egregiously, they attached as Exhibit 1 to their Supplemental Brief a document titled "Demographic Report on Out-Migration in Michigan" by someone named Matthew Hall, Ph.D. (*Id.*, Pg ID 1894 *et seq.*)[6] Thus, Defendants are attempting to cause this Court to rely on a previously-undisclosed, untested "expert" report that had not been previously provided to Plaintiff, in part because Defendants have refused to comply with their obligations under Rule 26 to confer regarding entry of a pre-trial scheduling order under Rule 16.[7] As a result, no expert report deadline has been set by this Court.

This Court should not countenance Defendants' refusal to play by the rules, and by the express orders of this Court to which they stipulated. To do otherwise is

---

[6] Defendants never disclosed this expert in any pre-trial communication, and never hinted in their negotiations over the Stipulated Order that they intended to rely on an expert witness to support an elaborated CAFA argument.

[7] This tactic necessitated a separate, previously-filed and still pending motion to require Defendants to participate in a Rule 26 conference. ECF #17, filed Sept. 7, 2018. Defendants are not only playing "hardball," they are playing "hide the ball," under rules that they are making up as they go along.

to invite chaos.

II.   PLAINTIFF WILL BE PREJUDICED IF THIS COURT DOES
      NOT STRIKE THE UNAUTHORIZED PORTIONS OF
      DEFENDANTS' SUPPLEMENTAL BRIEF.

Of course, Plaintiff is bound by the same Supplemental Briefing Order that

Defendants have violated. As such Plaintiff is limited to briefing only those issues

impacted by *Obduskey*—and cannot address Defendants' *ultra vires* arguments

without himself violating that order. Striking the designated portions of Defendants'

Supplemental Brief will avoid the prejudice that would otherwise result from

Plaintiff's compliance with the Supplemental Briefing Order.

In addition, Plaintiff believes that his FDCPA claims remain viable under

*Obduskey*, primarily because the Orlans Foreclosure Letter contains language that

does far more than convey information required by Michigan's foreclosure by

advertisement statute. Indeed, *none* of the content of that letter (Cmplt. Exh. A) is

required under the Michigan statute. Plaintiff negotiated the Stipulated Order,

including its page limitations, with an eye toward fully developing these arguments

in his Supplemental Response. Moreover, Plaintiff believes that Defendants misled

this Court in their motion for stay into anticipating that the *Obduskey* decision

would likely resolve the FDCPA claim in this case. *See* Order Granting Stay.

Plaintiff negotiated the scope of the Supplemental Briefing Order mindful of the

task he faced in demonstrating why, respectfully, in Plaintiff's view this Court's

11

anticipation was incorrect. Having to re-brief issues that were already were (or should have been) fully briefed will detract from and undermine Plaintiff's ability to fully develop these authorized arguments.

In addition to arguing that *Obduskey* signals that they are not "debt collectors," Defendants also argue that *Obduskey's* overruling of the *Glazer* holding gives lift to their related but separate argument that the Orlans Foreclosure Letter is not a communication "in connection with the collection of any debt," and therefore not subject to 15 U.S.C. § 1692e even if they *are* debt collectors. Def. Supp. Br. at 7-8 (ECF #29, Pg ID 1883-84.) As Defendants point out, Plaintiffs relied heavily on *Glazer* in rebutting this argument in the first round of briefing. Plaintiffs require all of the allocated pages and time under the Supplemental Briefing Order to demonstrate how, under the still-governing Sixth Circuit "animating purpose" case law—*apart from Glazer*—and the analyses of many courts in and out of this circuit, *an* animating purpose of the Orlans Foreclosure Letter was to induce payment. In short, being forced to devote additional weeks and pages to countering Defendants' belated, unauthorized supplemental CAFA arguments will prejudice Plaintiff by forcing him to reallocate limited resources to arguments other than those actually potentially impacted by *Obduskey*.

As noted, Defendants filed their reply brief in support of their motion to dismiss last September. Having improperly refused to participate in a Rule 26

conference, and having successfully obtained a stay pending *Obduskey* over Plaintiff's objection, they have now gained an extra seven months to find and attempt to introduce untested "expert" report regarding the CAFA issue, all while blocking *any* discovery of the actual jurisdictional facts to be found in their own records. *See* Rule 26(d)(1) ("A party may not seek discovery from any source before the parties have conferred as required by Rule 26(f) . . . ."). Under these circumstances, in order to avoid rewarding Defendants' "sandbagging," this Court should strike the unauthorized portions of Defendants' Supplemental Brief.

In essence, unless this Court acts Defendants will have pulled off an "end run" around the Sixth Circuit's Rule 12(b)(1) instruction in *Rogers v. Stratton Indus., Inc.,* 798 F.2d 913, 918 (6th Cir. 1986) ("The nonmoving party must . . . be afforded an ample opportunity to secure and present evidence relevant to the existence of jurisdiction.") There is not sufficient time, or procedural ability (i.e., availability of discovery), for Plaintiff to *both* address the impact of *Obduskey and* simultaneously try to meet Defendants' new, unauthorized arguments before his Supplemental Response is due. And a ruling on Defendant's motion to dismiss has already been unduly delayed by Defendants' actions.[8]

---

[8] Against this reality, it is worth noting that this action was filed on May 17, 2018. (ECF #1.) Defendants are the second largest mortgage foreclosure firm in Michigan and its owners and officers, who also have substantial operations in other several other states. They are represented by the same large law firm that represented a defendant in *Martin v. Trott Law PC,* Case No. 15-12838, E.D. Mich., where they

The efficient administration of justice demands that this Court not permit Defendants to violate its Supplemental Briefing Order, which sensibly limits additional briefing to the impact of *Obduskey,* to the prejudice of Plaintiff.

## III.   THIS COURT SHOULD ENTER A MODEST MONETARY SANCTION AGAINST DEFENDANTS.

Sanctions ought not be sought or granted absent compulsory rule or egregious conduct. Agreeing to a stipulated order, which is subsequently entered, and then violating it to the tune of 40% of your argument is egregious under any definition. To restore order to these proceedings, Plaintiff reluctantly asks that this Court enter sanctions against Defendants in the modest amount of $1,000.00, in order to partially compensate the time and effort of his counsel. This Court has abundant authority to enter such a sanction. Fed. R. Civ. P. 16(f)(1)(c) (authorizing sanctions for violation of a "pretrial order"); Fed. R. Civ. P. 83(b) (authorizing district courts to "regulate practice in any manner consistent with federal law . . . and the district's local rules," including by sanctions); *Chambers*, *supra* (discussing district court's inherent authority to sanction misconduct). *See also* Local Rule 7.1(a)(3) (permitting the taxing of costs for unreasonably withholding consent).

---

briefed many of the same CAFA issues (rejected by the Court in that case). Defendants' opening brief in support of their motion to dismiss this action was filed two months after the Complaint was filed, and their reply brief almost two months after that. There is no excuse under these circumstances for Defendants waiting a year—until the filing of their Supplemental Brief—to attempt to raise for the first time a belatedly elaborated and supported home state exception argument.

**Conclusion**

For the foregoing reasons, Plaintiff respectfully asks this Court to strike the designated portions of Defendants' Supplemental Brief in Support of Motion to Dismiss and enter monetary sanctions in the amount of $1,000.00 against Defendants to offset the time and effort necessary for Plaintiff's counsel to file this Motion.

Dated:  April 29, 2019

Respectfully submitted,

Andrew J. McGuinness (P42074)
ANDREW J. MCGUINNESS, ESQ.
122 S Main St, Suite 118
P O Box 7711
Ann Arbor, MI  48107
Phone: (734) 274-9374
drewmcg@topclasslaw.com

Samuel G. Firebaugh (P34276)
FIREBAUGH & ANDREWS PLLC
38545 Ford Rd, Ste 104
Westland, MI  48185
Phone: (734) 722-2999
samuelgfirebaugh@hotmail.com

*Counsel for Plaintiff and the Proposed Class*

15

CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on the above date a copy of the foregoing was filed with the Court using the ECF system, which will send notification of such filing to all parties who have appeared through their attorneys of record.

*/s/ Andrew J. McGuinness*
Andrew J. McGuinness

# EXHIBIT A

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
### Southern Division

Freddie Garland, individually and on
behalf of all others similarly situated,

      Plaintiff,

v.

Orlans PC, Linda Orlans, and Alison
Orlans,

      Defendants.

Case No. 2:18-cv-11561-DPH-RSW

Honorable Denise Page Hood
Magistrate Judge R. Steven Whalen

---

# STIPULATED ORDER LIFTING THE STAY AND
# ESTABLISHING SUPPLEMENTAL BRIEFING SCHEDULE

The Court having entered its November 21, 2018, Order Staying This Case Pending Ruling By The U.S. Supreme Court in *Obduskey v. McCarthy & Holthus LLP;* the United States Supreme Court having issued its decision in *Obduskey* on March 20, 2019; it being appropriate that the stay be lifted and there be supplemental briefing in connection with defendant's pending Motion to Dismiss (DE 7) in light of the Court's *Obduskey* decision; the parties having stipulated to the relief set forth herein; and the Court being otherwise advised in the premises:

IT IS HEREBY ORDERED that, in light of the Court's *Obduskey* decision:

1.    The STAY ordered by this Court on November 21, 2018 is LIFTED.

2.      Defendants shall file on April 24, 2019, a Supplemental Brief in Support of their pending Motion to Dismiss to address the impact on the motion of the *Obduskey* decision, which Supplement shall be no more than 15 pages.

3.      Plaintiff shall file on May 15, 2019, his Supplemental Response in Opposition to defendants' Motion to Dismiss to address the impact on the motion of the *Obduskey* decision, which Supplement shall be no more than 18 pages.

4.      Defendants shall file on May 29, 2019, their Supplemental Reply Brief in support of their Motion to Dismiss to address the impact on the motion of the *Obduskey* decision, which Reply shall be no more than 5 pages.

5.      The Court will address the hearing date in a future scheduling order.

Dated:  April 9, 2019

s/Denise Page Hood
Chief Judge, U. S. District Court

**The undersigned stipulate to the entry
of the foregoing order:**

Andrew J. McGuinness (P42074)          I.W. Winsten (P30528)

/s/ Andrew J. McGuinness                     /s/ I. W. Winsten
ANDREW J. MCGUINNESS, ESQ.             HONIGMAN LLP
   122 South Main Street                        2290 First National Building
   Ann Arbor, Michigan 48107                 660 Woodward Avenue
   Telephone: (734) 274-9374                   Detroit, MI  48226
   drewmcg@topclasslaw.com                Telephone: (313) 465-7000
   *Attorney for Plaintiff and the*            iwinsten@honigman.com
   *Proposed Class*                             *Attorney for Defendants*

# EXHIBIT B

| From: | Andrew J. McGuinness |
|-------|---------------------|
| To: | "Segal, Bruce L."; "Winsten, I. W." |
| Cc: | "samuelgfirebaugh@hotmail.com" |
| Bcc: | "Tiffany Ellis" |
| Subject: | RE: Garland v. Orlando PC, et SL. |
| Date: | Monday, April 1, 2019 10:39:00 AM |

Will do.

**From:** Segal, Bruce L. <BSegal@honigman.com>
**Sent:** Monday, April 1, 2019 9:59 AM
**To:** Andrew J. McGuinness <drewmcg@topclasslaw.com>; Winsten, I. W. <IWW@honigman.com>
**Cc:** samuelgfirebaugh@hotmail.com
**Subject:** RE: Garland v. Orlando PC, et SL.

Drew,
I have confirmed with Bill that your attached order is acceptable if you wish to file it today.
Bruce


Bruce L. Segal

_____

**HONIGMAN LLP**
O   248.566.8482
M   248.310.1696
bsegal@honigman.com

**From:** Andrew J. McGuinness [mailto:drewmcg@topclasslaw.com]
**Sent:** Friday, March 29, 2019 8:06 AM
**To:** Segal, Bruce L. <BSegal@honigman.com>; Winsten, I. W. <IWW@honigman.com>
**Cc:** samuelgfirebaugh@hotmail.com
**Subject:** RE: Garland v. Orlando PC, et SL.

Bruce:  Attached please find my revised edit of a draft stipulated order, which accepts the changes upon which we tentatively agree (including your request for 14 days to file your Supplemental Reply), but rejects your striking of the language that makes explicit that the purpose of the supplemental briefing is to address *Obduskey* (e.g., not an invitation to re-argue issues that have already been the subject of prior briefing and not affected by the *Obduskey* decision).

If this draft is acceptable to your clients, you have my permission to sign my name and file with the court via its ECF utility today. If this is not acceptable, please promptly advise so that plaintiff can get a motion filed today.

Thanks, Drew.

**From:** Segal, Bruce L. <BSegal@honigman.com>
**Sent:** Thursday, March 28, 2019 5:36 PM

**To:** Andrew J. McGuinness <drewmcg@topclasslaw.com>; Winsten, I. W. <IWW@honigman.com>
**Cc:** samuelgfirebaugh@hotmail.com
**Subject:** RE: Garland v. Orlando PC, et SL.

Drew,
As shown in the attached redline, I accepted your 15-18-5 pages and formatting changes. I put back the 14- day reply filing date that we had and put in just one place the reason for the supplemental filings (using the "in light of" language in the preamble).
Bruce


Bruce L. Segal
_____

**HONIGMAN LLP**
O   248.566.8482
M   248.310.1696
bsegal@honigman.com

**From:** Andrew J. McGuinness [mailto:drewmcg@topclasslaw.com]
**Sent:** Thursday, March 28, 2019 11:13 AM
**To:** Winsten, I. W. <IWW@honigman.com>
**Cc:** Segal, Bruce L. <BSegal@honigman.com>; samuelgfirebaugh@hotmail.com
**Subject:** RE: Garland v. Orlando PC, et SL.

Bill:  Your proposal is not accepted. We are willing to stipulate, however, to 15-18-5 pages, with the additional language noted in redline in the attached.

If this is not acceptable to defendants, then we should simply file a notice stating that the Supreme Court issued its *Obduskey* ruling; that per its previous order the stay has therefore expired; and requesting a briefing schedule for supplemental briefs.

If the first alternative is unacceptable, please consider this email a request under the local rule for defendant's concurrence with the second alternative above. We intend to file promptly a motion seeking a briefing schedule if neither stipulation is acceptable to defendants.

Thanks, Drew.

**From:** Winsten, I. W. <IWW@honigman.com>
**Sent:** Wednesday, March 27, 2019 3:16 PM
**To:** Andrew J. McGuinness <drewmcg@topclasslaw.com>
**Cc:** Segal, Bruce L. <BSegal@honigman.com>; samuelgfirebaugh@hotmail.com
**Subject:** RE: Garland v. Orlando PC, et SL.

In follow up to our call, attached is a proposed stipulated order. It tracks what we discussed except I gave you 2 more pages on your brief in exchange for us getting 2 more pages on our reply.

Please let me know if this order works at your end.

I. W. Winsten

Co-Leader, Complex Commercial Litigation Practice Group

**HONIGMAN LLP**
O   313.465.7608
M   313.610.5449
iww@honigman.com

---

**From:** Winsten, I. W.
**Sent:** Monday, March 25, 2019 12:19 PM
**To:** Andrew J. McGuinness <drewmcg@topclasslaw.com>
**Cc:** Segal, Bruce L. <BSegal@honigman.com>; samuelgfirebaugh@hotmail.com
**Subject:** RE: Garland v. Orlando PC, et SL.

Not yet. We will have a fuller discussion on Wednesday and then we can discuss a stip.

I. W. Winsten

Co-Leader, Complex Commercial Litigation Practice Group

**HONIGMAN LLP**
O   313.465.7608
M   313.610.5449
iww@honigman.com

---

**From:** Andrew J. McGuinness [mailto:drewmcg@topclasslaw.com]
**Sent:** Monday, March 25, 2019 12:16 PM
**To:** Winsten, I. W. <IWW@honigman.com>
**Cc:** Segal, Bruce L. <BSegal@honigman.com>; samuelgfirebaugh@hotmail.com
**Subject:** RE: Garland v. Orlando PC, et SL.

Shall I circulate a draft stipulation?

---

**From:** Winsten, I. W. <IWW@honigman.com>
**Sent:** Monday, March 25, 2019 10:01 AM
**To:** Andrew J. McGuinness <drewmcg@topclasslaw.com>
**Cc:** Segal, Bruce L. <BSegal@honigman.com>
**Subject:** RE: Garland v. Orlando PC, et SL.

Drew, I will get back to you on Wednesday.

I. W. Winsten

Co-Leader, Complex Commercial Litigation Practice Group

---

**HONIGMAN LLP**
O   313.465.7608
M   313.610.5449
iww@honigman.com

**From:** Andrew J. McGuinness [mailto:drewmcg@topclasslaw.com]
**Sent:** Thursday, March 21, 2019 4:26 PM
**To:** Winsten, I. W. <IWW@honigman.com>
**Subject:** Garland v. Orlando PC, et SL.

Bill, left you a voicemail. Please call me at 734-646-8778 to discuss next steps in light of Obduskey decision. Drew.

This e-mail may contain confidential or privileged information.  If you are not the intended recipient, please delete it and notify the sender of the error.

# EXHIBIT C

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

Freddie Garland, individually and on behalf of all others similarly situated,

     Plaintiff,

v.

Orlans PC, Linda Orlans, and Alison Orlans,

     Defendants.

Case No. 2:18-cv-11561-DPH-RSW

Honorable Denise Page Hood
Magistrate Judge R. Steven Whalen

---

Andrew J. McGuinness, Esq.
Andrew J. McGuinness (P42074)
Suite 118
122 South Main Street
Ann Arbor, Michigan 48107
Telephone: (734) 274-9374
drewmcg@topclasslaw.com


Firebaugh & Andrews PLLC
Samuel G. Firebaugh (P34276)
38545 Ford Road
Suite 104
Westland, Michigan 48185
Telephone: (734) 722-2999
samuelgfirebaugh@hotmail.com


Attorneys for Plaintiff

Honigman LLP
I. W. Winsten (P30528)
Bruce L. Segal (P36703)
Suite 2290
660 Woodward Avenue
Detroit, Michigan 48226
Telephone: (313) 465-7608
iwinsten@honigman.com
bsegal@honigman.com

Attorneys for Defendants

---

# DEFENDANTS' SUPPLEMENTAL BRIEF IN SUPPORT
# OF THEIR MOTION TO DISMISS IN LIGHT OF THE SUPREME
# COURT'S DECISION IN *OBDUSKEY v. McCARTHY & HOLTHUS LLP*

# TABLE OF CONTENTS

INDEX OF AUTHORITIES ...................................................................... ii

INTRODUCTION ....................................................................................1

BACKGROUND .....................................................................................1

    A.   Garland's Claims .....................................................................1

    B.   Procedural Background ...........................................................3

ARGUMENT ..........................................................................................5

    I.   Garland Has Failed to State an FDCPA Claim ........................5

        A.   Obduskey Is Dispositive .........................................5

        B.   Nothing in the Garland Foreclosure Letter Transforms Defendants into Debt Collectors under the FDCPA ........................................................6

    II.   Garland's State-Law RCPA Claim Should Be Dismissed ..................8

        ~~A.~~   ~~There Is No Original Jurisdiction under CAFA~~ .......................8

        ~~B.~~   ~~CAFA's Mandatory Home-State Abstention Provision Prohibits the Exercise of CAFA Jurisdiction Over Garland's RCPA Claim~~ ...............................9

        ~~C.~~   ~~The Court Can, and Should, Also Decline the Exercise of Jurisdiction under CAFA's Discretionary Abstention Provision~~ ..........................11

        D.   The Court Should Dismiss Garland's State-Law Claim, Particularly in Light of *Obduskey* .................................12

CONCLUSION .....................................................................................15

# INDEX OF AUTHORITIES

**CASES**             **Page(s)**

*Fed. Home Loan Mortg. Corp. v. Lamar*,
   503 F.3d 504 (6th Cir. 2007) ................................................................7

*Feld v. Robert & Charles Beauty Salon*,
   435 Mich. 352 (1990) ........................................................................14

*Glazer v. Chase Home Finance LLC*,
   704 F.3d 453 (6th Cir. 2013) ......................................................1, 2, 5

*Goodson v. Bank of Am. N.A.*,
   600 F. App'x 422 (6th Cir. 2015) ........................................................7

*Grden v. Leikin Ingber & Winters PC*,
   643 F.3d 169 (6th Cir. 2011) ...............................................................7

*Helman v. Udren Law Offices, P.C.*,
   85 F. Supp.2d 1319 (S.D. Fla. 2014) ...................................................8

*Hoerstman Gen. Contr., Inc. v. Hahn*,
   474 Mich. 66 (2006) .........................................................................14

*Mason v. Lockwood, Andrews & Newnam, P.C.*,
   842 F.3d 383 (6th Cir. 2016) .........................................................10, 11

*Mills v. Select Portfolio Serv., Inc.*,
   No. 18-cv-61012-BLOOM/Valle, 2018 WL 5113001 (S.D. Fla.
   Oct. 19, 2018) ....................................................................................8

*Obduskey v. McCarthy & Holthus LLP*,
   586 U.S. ____ (Mar. 20, 2019) ...................................................*passim*

*Ronald Sciortino Bankr. Estate v. Selene Fin. L.P.*,
   No. 1:18-CV-0981-AT-JFK, 2018 WL 7075245 (N.D. Ga. Nov.
   11, 2018) ............................................................................................8

*Sexton v. Panel Processing, Inc.*,
   912 F. Supp. 2d 457 (E.D. Mich. 2012), *aff'd*, 754 F.3d 332 (6th
   Cir. 2014) ....................................................................................4, 13

*Waters v. Kream*,
   770 F.Supp.2d 434 (D. Mass. 2011) ................................................................ 7

**STATUTES AND COURT RULES**

15 U.S.C. §1692(e) ........................................................................................... 6

28 U.S.C. §1332(d)(3) ...................................................................................... 12

28 U.S.C. §1332(d)(4)(B) .......................................................................... 10, 11

Fed R. Civ. P. 12(b)(1) ..................................................................................... 1, 3

Fed R. Civ. P. 12(b)(6) ..................................................................................... 1, 3

MCL §445.251 ............................................................................................. 14, 15

MCL §445.252 ................................................................................................. 15

MCR 3.501(A)(1)(5) ......................................................................................... 12

# INTRODUCTION

In *Obduskey v. McCarthy & Holthus LLP*, the Supreme Court just held that (with one inapplicable exception) the Fair Debt Collection Practices Act (the "FDCPA") does *not* apply to non-judicial foreclosures like the one at issue here. *Obduskey*, 586 U.S. ___, Slip Op. at 2, 10, 14 (Mar. 20, 2019). *Obduskey* confirms that Plaintiff Freddie Garland has not stated an FDCPA claim here against Defendants and that his only Federal law claim should be dismissed as a matter of law. Moreover, Garland has no legitimate jurisdictional or substantive basis for his much more expansive state-law claim, and this entire case should be dismissed.[1]

# BACKGROUND

## A.    Garland's Claims

This is Garland's second FDCPA lawsuit based on a letter (which he refers to as the "Garland Foreclosure Letter") that he received in advance of a non-judicial foreclosure by Orlans PC. (*See* Compl., Dkt. No. 1, ¶¶40, 41, 51, & Ex. A). This Court dismissed Garland's first FDCPA claim because it found no evidence that the letter had misstated the amount of Garland's unpaid debt.

In this second lawsuit, Garland again asserts an FDCPA claim based on the

---

[1] When Defendants moved to dismiss this action under both Rules 12(b)(1) and 12(b)(6), the Sixth Circuit's decision in *Glazer v. Chase Home Finance LLC*, 704 F.3d 453 (6th Cir. 2013), was still controlling law. *Obduskey* has now effectively overruled *Glazer*. To the extent necessary, Defendants request that this Supplemental Brief be treated as an amendment of their pending motion.

Garland Foreclosure Letter, along with a state-law claim under the Michigan Regulation of Collection Practices Act (the "RCPA"), this time as purported class action. Garland no longer claims that the letter contains any false information. Instead, he claims only that the letter violates the FDCPA and the RCPA for one reason – the letter was signed by the law firm, "Orlans PC," but he "was not certain whether or not [it] was from an attorney." (*See, e.g.*, *id.* ¶47.)

Notably, the letter was *not* a collection letter – it made *no demand for payment* of his debt, made *no reference to a payment due date*, and made *no threat of a penalty for nonpayment*. Rather, it was simply an informational letter, notifying Garland that "[w]hile the foreclosure process has begun, [he] may still have foreclosure prevention alternatives available to [him]." (*See id.* Ex. A.)

Nevertheless, Garland alleged in his Complaint that, under the Sixth Circuit's ruling in *Glazer*, any person who seeks by a non-judicial foreclosure to enforce a security interest is a debt collector under the FDCPA. (Compl. ¶112.) He made the same argument in response to Defendants' Motion to Dismiss. (Pl.'s Resp. in Opp'n to Defs.' Mot. to Dismiss (Corrected), Dkt. 15 ("Garland's Resp."), at 7-10.)

However, as explained below, under the Supreme Court's ruling *Obduskey*, *Glazer* has been effectively reversed, and this, in itself, is reason to dismiss Garland's FDCPA claim since *Glazer* was the only basis for Garland's allegation that Defendants are debt collectors under the FDCPA.

## B.    Procedural Background

Garland filed his first FDCPA complaint against Orlans PC shortly after his release from the Milan Federal Penitentiary. (*See, e.g.*, *Garland v. Wells Fargo Home Mortg. Inc*., 2:17-cv-12246, Order Granting Orlans PC's Mot. to Dismiss & Wells Fargo Mot. to Dismiss and/or for Summ. J., Dkt. 10, at 2 (E.D. Mich. Mar. 29, 2018).) This Court granted Orlans PC's motion to dismiss because Garland failed to identify any false statement in Orlans PC's letter to him.  (*Id*. at 16-17.)

Two months later, Garland filed this purported class action against Orlans PC. Defendants timely filed a motion to dismiss Garland's second action in its entirety under Rules 12(b)(1) and 12(b)(6). As Defendants explained, Garland failed to state a claim under the FDCPA because there was nothing in the Garland Foreclosure Letter that said anything about him paying his debt, which is the *sine qua non* of a collection letter under the FDCPA. (*See* Br. in Supp. of Defs.' Mot. to Dismiss under Rules 12(b)(1) and 12(b)(6) ("Defs.' Br."), (Dkt. 7), at 22-25.)

As Defendants further explained, there are both jurisdictional and substantive grounds that require the dismissal of Garland's much larger state-law RCPA claim, which has a class period six times longer than his FDCPA claim. (*See* Compl. ¶¶93, 94.) Garland failed to allege facts demonstrating Federal Court jurisdiction over his state-law claim under the Class Action Fairness Act (CAFA) to support either (1) his conclusory and untrue allegation that the amount in controversy exceeds the

minimum required sum of $5 million, or (2) his speculation that CAFA's minimum diversity requirement was satisfied because some unidentified members of his purported class, all of whom resided in Michigan when they received the complained-of letters, subsequently moved out of Michigan. (Defs.' Br. at 9-11.) Moreover, the exercise of CAFA jurisdiction is prohibited by CAFA's mandatory abstention provision. (*Id*. at 11, n.3.)

Second, Defendants explained, there is no reason to exercise supplemental jurisdiction over Garland's state-law claim because "a federal court that has dismissed a plaintiff's federal-law claims should not ordinarily reach the plaintiff's state-law claims." *Sexton v. Panel Processing, Inc.*, 912 F. Supp. 2d 457, 474 (E.D. Mich. 2012), *aff'd*, 754 F.3d 332 (6th Cir. 2014).

Finally, as Defendants explained, Garland's second complaint fails to allege the facts necessary to state a claim under the RCPA. (*See* Defs.' Br. at 20-22.) Accordingly, Defendants' motion sought dismissal of Garland's entire action.

While Defendants' motion was pending, the Supreme Court granted leave to consider the Tenth Circuit's *Obduskey* decision, which refuted the very premise of Garland's FDCPA claim. After Defendants' motion was fully briefed, this Court stayed this action pending the Supreme Court's ruling in *Obduskey*, explaining that "if non-judicial mortgage foreclosures are not covered by the FDCPA, Plaintiff's FDCPA claim likely will fail as a matter of law." (Order Staying the Case Pending

Ruling by the U.S. Supreme Court in *Obduskey v. McCarthy & Holthus LLP*, Dkt. 27, at 3.) The Court further explained:

> [I]f there is no potentially viable FDCPA claim before the Court, the Court would be stripped of federal subject matter jurisdiction and likely would exercise its discretion to decline supplemental jurisdiction over Plaintiff's RCPA claim. The RCPA claim is rooted in Michigan law but whether it applies to a non-judicial foreclosure has not been litigated or decided by Michigan courts. For that reason, in the absence of federal subject matter jurisdiction, the Court believes that a determination of the RCPA's applicability to a non-judicial foreclosure would best be litigated in Michigan state courts.

(*Id.*)

## ARGUMENT

## I.     Garland Has Failed to State an FDCPA Claim

### A.     Obduskey Is Dispositive

In *Obduskey*, the Supreme Court expressly held that enforcing a security interest by way of non-judicial foreclosure does *not* ordinarily make a person a debt collector under the FDCPA. Slip op. at 2, 10, 14. As the Court held:

> In our view, the last sentence [of the FDCPA's definition of a "debt collector"] does (with its §1692f(6) exception) place those whose "principal purpose . . . is the enforcement of security interests" outside the scope of the primary "debt collector" definition, §1692a(6), where the business is engaged in no more than the kind of security-interest enforcement at issue here—nonjudicial foreclosure proceedings.

Slip op. at 1-2.

Here, Garland's own allegations in his Complaint undeniably admitted that Orlans PC's "principal purpose" is the enforcement of security interests through

non-judicial foreclosure proceedings. As Garland expressly concedes:

- "Orlans PC is engaged in the business of foreclosing on homes, and a large portion of its business derives from its foreclosure practice," and

- "the vast majority of non-commercial residential property foreclosures conducted by Orlans PC in Michigan and in other states have been pursuant to non-judicial foreclosure statutes."

(Compl. ¶¶25, 39.) Thus, Garland's own Complaint concedes that Orlans PC's principal purpose is non-judicial foreclosures and that, under *Obduskey*, its conduct in doing so "falls outside" the definition of a "debt collector" under the FDCPA. Garland's FDCPA claim must therefore be dismissed.

## B.    Nothing in the Garland Foreclosure Letter Transforms Defendants into Debt Collectors under the FDCPA

The fundamental purpose of the FDCPA is to "eliminate *abusive* debt collection practices." 15 U.S.C. §1692(e) (emphasis added). Recognizing this, the *Obduskey* Court expressly noted that its holding is not "a license to engage in abusive debt collection practices like repetitive nighttime phone calls." Slip op. at 13.

Garland will certainly argue that, regardless of *Obduskey*, Orlans PC should be treated as a debt collector. But, as noted above, Garland does *not* allege that Defendants engaged in any abusive debt collection practices. To the contrary, Garland alleges only that he was not sure if the letter that Orlans PC sent to him, notifying him of options to avoid foreclosure, was actually from an individual attorney. This does not make Orlans PC a debt collector under the FDCPA.

Likewise, the fact that Orlans PC's letter informed Garland of options to avoid foreclosure does not make Orlans PC a debt collector. The letter does not demand payment. In fact, it says *nothing* about payment of Garland's debt, and, under *Obduskey*, it is "nonsensical" for Garland to now argue that the letter makes Orlans PC a debt collector. *See, e.g.*, *Fed. Home Loan Mortg. Corp. v. Lamar*, 503 F.3d 504, 513-14 (6th Cir. 2007) ("we will not 'countenance lawsuits based on frivolous misinterpretations or nonsensical assertions of being led astray'").

Moreover, even before *Obduskey* made clear that engaging in non-judicial foreclosures does not make one a debt collector under the FDCPA, the Sixth Circuit held that the FDCPA "'does not apply to every communication between a debt collector and a debtor.'" *Grden v. Leikin Ingber & Winters PC*, 643 F.3d 169, 173 (6th Cir. 2011). Thus, for example, the statute does not apply to informational letters that do not demand payment of a debt, reference payment due dates, or threaten penalties for nonpayment. *See, e.g., Goodson v. Bank of Am. N.A.*, 600 F. App'x 422, 432 (6th Cir. 2015) (relying on absence of these factors to find that letter was not within Section 1692e); *Waters v. Kream*, 770 F.Supp.2d 434 (D. Mass. 2011) (letter was not a "pay up or else" letter).

More specifically, the courts have held that letters that advise of alternatives to foreclosure, like the Garland Foreclosure Letter, are *not* within the statute. *See, e.g.*, *Ronald Sciortino Bankr. Estate v. Selene Fin. L.P.*, No. 1:18-CV-0981-AT-JFK,

7

2018 WL 7075245 (N.D. Ga. Nov. 11, 2018); *Mills v. Select Portfolio Serv., Inc.*,

No. 18-cv-61012-BLOOM/Valle, 2018 WL 5113001, at *3 (S.D. Fla. Oct. 19,

2018); *Helman v. Udren Law Offices, P.C.*, 85 F. Supp.2d 1319 (S.D. Fla. 2014).

For example, as the *Mills* court explained:

> The Mortgage Assistance Letter provides information regarding alternatives to foreclosure. It is not a "dunning" letter, which is a letter that is generated to demand payment or otherwise collect upon a debt. *LeBlanc v. Unifund CCR Partners,* 601 F.3d 1185, 1189 n. 7 (11th Cir. 2010) (defining a dunning letter). The Mortgage Assistance Letter does not demand payment. It does not deliver an ultimatum or establish an arbitrary deadline. The Court therefore finds that sending the Mortgage Assistance Letter was not debt collection activity.|

*Mills*, 2018 WL 5113001, at *3.

> Simply put, Garland has failed to state a claim under the FDCPA because:
>
> 1.    Under *Obduskey*, engaging in a non-judicial foreclosure does not make Defendants debt collectors under the FDCPA,
>
> 2.    Garland admits that Orlans PC's principal practice is non-judicial foreclosures, and
>
> 3.    Nothing in the Garland Foreclosure Letter is abusive or demands, or says anything about, payment of Garland's debt.

Therefore, Garland's only federal claim must be dismissed as a matter of law.

## II.    Garland's State-Law RCPA Claim Should Be Dismissed

### ~~A.    There Is No Original Jurisdiction under CAFA~~

~~Garland has also asserted a state-law claim under the RCPA. But, as explained~~

~~in Defendants' Motion to Dismiss, there is no original CAFA jurisdiction over~~

Garland's state-law claim because he has not alleged *facts* to show that the amount at issue exceeds the $5 million minimum requirement under CAFA. Moreover, Defendants have provided documentary evidence demonstrating that Garland's conclusory allegation has no basis in fact. (*See* Defs.' Br., Ex. 3.)

In addition, Garland failed to allege any *facts* to demonstrate that the required minimal diversity exists, *i.e.*, that some class members, all of whom originally "were Michigan residents," (Compl. ¶9), have now moved out of the state. 28 U.S.C. §1332(d)(2)(A). Nor did he present any facts to support his speculative diversity allegation in his response to Defendants' motion. Indeed, *Garland did not even mention this jurisdictional deficiency*, which is, in itself fatal to his assertion of CAFA jurisdiction because:

> "[t]he established rule is that a plaintiff, suing in a federal court, must show in his pleading, affirmatively and distinctly, the existence of whatever is essential to federal jurisdiction [.]" This long-settled principle derives from the fact that federal courts are courts of *limited* jurisdiction. As a consequence of this restriction on federal judicial power, federal jurisdiction may not be "maintained by mere averment," "inferred argumentatively," or "supplied by inference," Put differently, and in terms germane to the present discussion, there is a *presumption* against federal jurisdiction.

*Mason v. Lockwood, Andrews & Newnam, P.C.*, 842 F.3d 383, 391-92 (6th Cir. 2016) (brackets and italics in original; citations omitted).

### B.    CAFA's Mandatory Home-State Abstention Provision Prohibits the Exercise of CAFA Jurisdiction Over Garland's RCPA Claim

As noted in Defendants' motion to dismiss, even if Garland had established

9

original CAFA jurisdiction, under CAFA's mandatory home-state exemption, the Court "shall decline to exercise jurisdiction" if more than two-thirds of the class members and the primary defendants are citizens of this state. 28 U.S.C. §1332(d)(4)(B).[2] Moreover, as the Sixth Circuit explained in *Mason*, when dealing with CAFA's *exemptions* from jurisdiction, it is presumed that a person's domicile remains unchanged until *actual facts* establish otherwise. 842 F.3d at 390, 392.

Therefore, since Garland's proposed RCPA class consists entirely of persons who "were Michigan residents" at the time their alleged RCPA claims arose, (Compl. ¶9)), unless Garland proves that more than one-third of the class moved out of Michigan, the home-state exemption applies as a matter of law. It defies both the presumption of continued Michigan domicile and common sense for Garland to rely on speculation that *more than one-third* of these people *moved out of Michigan*.[3]

Even though Garland has the burden of producing evidence that more than one-third of the class members have moved out of Michigan under *Mason*, Defendants engaged a demographic mobility expert to confirm the obvious – far less than one-third of Garland's proposed class members have moved out of Michigan. (*See* Matthew Hall Expert Report & curriculum vitae attached as Ex. 1.) Matthew

---

[2] As alleged in Garland's Complaint, all of the Defendants reside in Michigan. (Compl. ¶¶13, 17, 19.)

[3] Indeed, Garland's proposed RCPA class consists of everyone who was sent a foreclosure letter, not those whose foreclosure was completed. (Compl. ¶94.)

Hall, a professor at Cornell University, is an expert on migration patterns in the United States with numerous peer-reviewed articles on this subject, including migration patterns following foreclosure.

As shown in his Expert Report, Professor Hall concludes that, in the aggregate, only 7.5% to 9% of Michigan residents who were the subject of a foreclosure initiation between 2011 and 2019 have moved out of Michigan. His conclusion confirms that far, far less than one-third of Garland's proposed RCPA Subclass members are no longer Michigan residents.

Thus, regardless of whether Garland had established *original* jurisdiction under CAFA (which he did not do), under CAFA's mandatory home-state abstention provision, the Court must "decline to exercise [CAFA] jurisdiction" over Garland's state-law claim. 28 U.S.C. §1332(d)(4)(B).

### C. The Court Can, and Should, Also Decline the Exercise of Jurisdiction under CAFA's Discretionary Abstention Provision

CAFA also has a discretionary abstention provision that permits the Court to decline the exercise of jurisdiction over Garland's RCPA claim if between one-third and two-thirds of his purported class members reside in Michigan. 28 U.S.C. §1332(d)(3). The factors to be considered include whether the claims involve matters of national or interstate interest; whether the claims asserted will be governed by the laws of the State in which the action was filed or by the laws of another State; and whether the number of citizens of the State in which the action was filed is

11

~~substantially larger than the number of citizens from other States.  *Id*.~~

~~Here, there is no national or interstate interest whatsoever in Garland's state-law claim. It involves only the application of Michigan law to Michigan homeowners who resided in Michigan at the time of the alleged violation. In other words, this is a purely local matter and no reason for federal court involvement.~~

~~Indeed, there is really only one reason that Garland brought his RCPA claim as a class action in Federal court – because he is trying to avoid the Michigan Supreme Court's rule, MCR 3.501(A)(1)(5), that explicitly *prohibits* him from bringing his claim as a class action in state court. (*See* Defs.' Br. at 15-16.)⁴ Thus, even if there was CAFA jurisdiction over Garland's RCPA class claim (there is not), and even if mandatory abstention did not apply (it does), the Court can, and should, decline the exercise of CAFA jurisdiction over Garland's state-law class action.~~

### D. The Court Should Dismiss Garland's State-Law Claim, Particularly in Light of *Obduskey*

Defendants' Motion to Dismiss already explains why the Court should dismiss, or decline to exercise supplemental jurisdiction over, Garland's RCPA claim. (Defs.' Br. at 13-20.)  In light of *Obduskey*, there are even more reasons to do

---

⁴ ~~Garland's RCPA claim seeks only statutory damages, and while he may maintain an *individual* claim for statutory damages, under MCR 3.501(A)(1)(5), his claim "may not be maintained as a class action unless the statute specifically authorizes its recovery in a class action." And, since the RCPA does *not* authorize class actions, he cannot bring his RCPA claim as a class action in state court.~~

so.

First, it is well-established that "a federal court that has dismissed a plaintiff's federal-law claims should not ordinarily reach the plaintiff's state-law claims." *Sexton v. Panel Processing, Inc.*, 912 F. Supp. 2d 457, 474 (E.D. Mich. 2012), *aff'd*, 754 F.3d 332 (6th Cir. 2014). Therefore, if the Court dismisses Garland's FDCPA claim, it should not reach his state-law claim.

Second, as the Court noted in its Order staying this case, Garland's RCPA claim is rooted in state law, and a determination of the RCPA's applicability to a non-judicial foreclosure would best be litigated in Michigan state courts. (Order Staying this Case at 3.) This Court's decision is particularly apt in light of *Obduskey's* holding that persons who engage in non-judicial foreclosures (like the one here) are not debt collectors.

In fact, the courts in this Circuit have described the RCPA and the FDCPA as "parallel" statutes, and, due to the RCPA's "similarity to the FDCPA," the courts in this Circuit have looked to the FDCPA for "guidance" in interpreting the RCPA. *Gamby v. Equifax Info. Servs. LLC*, 462 F. App'x 552, 556 (6th Cir. 2012); *accord Martin v. Trott Law, P.C.*, 265 F. Supp. 3d 731, 749 (E.D. Mich. 2017) (the "statutory rights under [the RCPA] parallel those guaranteed under the FDCPA"); *Boone v. Portfolio Recovery Assocs., LLC*, No. 2:14-CV-12281, 2014 WL 5473082, at *3 (E.D. Mich. Oct. 27, 2014) ("Courts generally look to the FDCPA in analyzing

13

claims under the MCPA."). And, not surprisingly, the language of the RCPA itself, particularly, the Michigan Legislature's definition of who is, and who is not, a "regulated person" under the RCPA shows that, like the FDCPA, the RCPA does not apply to statutory non-judicial foreclosures.

The RCPA only applies to "Regulated person[s]," and it specifically *exempts* collection agencies from its definition of "Regulated person." MCL §445.251(g). Notably, a "Collection agency" includes a person who is engaged *either* in "collecting or attempting to collect a claim" *or* in "repossessing or attempting to repossess a thing of value owed or asserted to be owed or due." *Id*. §445.251(b).

On the other hand, the definition of a "regulated person" includes *only* "[an] attorney who is handling *a collection or claim* on behalf of a client and in the attorney's own name." *Id*. §445.251(g)(xi) (emphasis added). The statute does *not* say that it includes an attorney who is "repossessing or attempting to repossess a thing of value." Likewise, while the RCPA prohibits misleading statements in communications "to collect a debt" or "in connection with collecting a debt," it says *nothing* about communications regarding "repossessing or attempting to repossess a thing of value" (*e.g*., a foreclosure). *Id*. §445.252(e).

Had the Michigan Legislature had intended to define a "regulated person" under the RCPA to include a person engaged in a repossession or foreclosure, it certainly could have said so. And, under the well-recognized principle of *expressio*

14

*est unius exclusio alterius*, the expression of one thing suggests the exclusion of all others, *Feld v. Robert & Charles Beauty Salon*, 435 Mich. 352, 362 (1990), it is clear that the RCPA does not apply to persons engaged in foreclosures. *Accord Hoerstman Gen. Contr., Inc. v. Hahn*, 474 Mich. 66, 75 (2006) ("no maxim is more uniformly used to properly construe statutes").

Thus, the RCPA, like the FDCPA, does not apply to persons engaged in non-judicial foreclosures, and Garland's state-law claim should be dismissed outright for this and the other reasons explained in Defendants' Motion to Dismiss. Even if the Court does not dismiss Garland's RCPA action outright, it should leave this issue to be litigated in the Michigan state courts, which have yet to address this issue.

## CONCLUSION

For the reasons stated in Defendants' Motion to Dismiss, and in light of *Obduskey*, this action should be dismissed in its entirety.

HONIGMAN LLP
Attorneys for Defendants

By: /s/ Bruce L. Segal
    I. W. Winsten (P30528)
    Bruce L. Segal (P36703)

CERTIFICATE OF SERVICE

I certify that on April 24, 2019, I electronically filed the preceding paper with

the Clerk of the Court using the ECF system, which will send notification of the

filing to all ECF participants, and I certify that I have mailed the preceding paper by

United States Postal Service to the following non-ECF participants:  None.


HONIGMAN LLP
Attorneys for Defendants

By: /s/ Bruce L. Segal
    I. W. Winsten (P30528)
    Bruce L. Segal (P36703)
    2290 First National Building
    660 Woodward Avenue
    Detroit, Michigan 48226
    Telephone: (313) 465-7608
    iwinsten@honigman.com
    bsegal@honigman.com

# EXHIBIT 1

**Demographic Report on Out-Migration in Michigan**
Matthew Hall, Ph.D.

April 18, 2019

## Introduction and Summary Finding

I have been asked to offer my opinion on the interstate migration behaviors of Michigan residents who began the foreclosure process. Based on my analysis of demographic data and published research on foreclosure migration, I conclude that, from 2011 to 2018, 7.5% to 9.0% of Michigan residents who experienced a foreclosure start moved to another US state.

## Expertise

My professional expertise lies in the areas of demography and public policy analysis, with emphasis on U.S. migration patterns, housing, and neighborhood policy. After completing my doctoral training at Pennsylvania State University in 2010, I have held faculty positions at the University of Illinois and Cornell University, where I am currently an Associate Professor of Policy Analysis & Management. My academic record includes more than 30 peer-reviewed publications, including demographic research on geographic migration (Hall 2009; Crowder et al. 2011; Hall & Crowder 2014; Burkhauser et al. 2016; Hall & Hibel 2017), foreclosure prevalence (Hall et al. 2015a), the correlates and impacts of the foreclosure crisis (Hall et al. 2015b; Rugh & Hall 2016), and the migration patterns of foreclosed households (Hall et al. 2018). I am an Associate Editor of *International Migration Review* and serve on the editorial board for *Demography*. I am also the 2016 recipient of the Early Career Award from the Penn State Alumni Association. My *Curriculum Vitae* is included as Appendix A.

## Demographic Analysis

At the national level, geographic migration is at historic lows, with annual mobility rates – including all types of moves – of 10.1 percentage points, the lowest mobility rate in the Census Bureau's time series of data from the Current Population Survey (U.S. Census 2018). Interstate migration, i.e., the movement of persons across U.S. states, constitutes a small slice of this overall rate, with just 1.5 percent of the U.S. population making an interstate move in the last year. Since 2010, the average annual rate of interstate migration is 1.6% (U.S. Census Bureau 2018). The most recent estimate of the five-year interstate mover rate – for the 2005-2010 period – is 5.6%, with a historical five-year high (for 1985-1990) of 9.4% (Ihkre and Faber 2012).

Demographic analysis of the State of Michigan indicates that mobility rates for Michigan residents are comparable to national rates. Analysis of Public-Use Microdata Samples from the 2011-2017[1] American Community Surveys reveal rates of annual out-migration from Michigan between 1.5% (in 2017) and 2.0% (in 2011). Extrapolating this trend to include 2018, and assuming no return migration, generates an upper-bound 2011-2018

---

[1] The 2018 data has not been released, so this time period represents the closest parallel to the reference (2011-2018) period.

cumulative out-migration rate of 13.9%. Incorporating a plausible 14% estimate[2] of return migration generates a 2011-2018 cumulative out-migration rate of 11.9%. Repeating this exercise for all 50 states yields a corresponding national rate of 2011-2018 cumulative interstate migration of 16.3%. Demographic data thus indicate that out-migration from Michigan is meaningfully and statistically lower than other U.S. states.[3]

It is known that migration rates for persons who start the foreclosure process are higher than for other persons. This is due to the foreclosure process finalizing in the loss of housing, but also to the financial insecurity that is related to, or triggered by, foreclosure initialization. Empirical research and migration theory, however, indicate that these foreclosure-related moves are likely to be local in nature. Broadly speaking, interstate moves are elevated among households with greater socioeconomic resources (necessary for long-distance moves), for households relocating for work-related reasons, and for young adults investing in education (Crowder & Hall 2006; Greenwood 1997; Ihrke, Faber, and Koerber 2011; White & Lindstrom 2006). In contrast, moves related to economic insecurity and for housing reasons tend to be local. This partly reflects local moves having fewer monetary constraints, but largely reflects strong preferences for remaining in local communities where social (family and peer) networks are entrenched, relationships with schools are established, and neighborhood and housing options are known. Analysis of data from the 2011-2018 Current Population Survey, which includes survey items on reasons for migrating, supports these arguments, finding that among individuals who moved due to "foreclosure or eviction," only 3.8% moved to another state (versus 13.9% for migrants stating other reasons).

Empirical demographic and economic research has specifically assessed patterns of foreclosure migration. Based on a nationally-representative sample of U.S. households, Hall et al. (2018) report a mobility rate of 53.6% for white households who reported a foreclosure start between 2001 and 2013. (Mobility rates for black and Latino households who reported a foreclosure start were even lower at, 44.6% and 37.7%, respectively.) Using a panel of consumer credit data, Molloy and Shan (2013) report a five-year mobility rate for foreclosed persons of 56%. Most importantly, Molloy and Shan's (2013) analysis indicates that the vast majority of these moves were within states; for the 2000-2005 period, just 16% of movers in the foreclosure group changed states (vs 18% in the comparison group); and in the 2006-2008 period, just 14% of movers in the foreclosure group made an inter-state move (vs. 18% in the comparison group).

The overall estimate of interstate migration among those for whom the foreclosure process was initialized is the product of the likelihood of moving and the likelihood of changing states conditional on moving. **Thus, the relevant demographic data and**

---

[2] This estimate is derived from analysis of interstate movers in the Panel Study on Income Dynamics, a nationally-representative longitudinal sample of U.S. households. Among those who made interstate moves between 2005 and 2011, 13.8% return to their origin state within six years.

[3] Statistical tests (one-sample proportion z-test) indicate that Michigan's rate of out-migration is significantly lower than the national rate of interstate migration ($z$=97.6; $P < 0.0001$).

**published academic research indicate that among those experiencing a foreclosure start, the cumulative interstate migration rate is between 7.5% (.536\*.14) and 9.0% (.56\*.16).**

While the time periods covered in the empirical studies used to base these calculations do not perfectly align with the reference (2011-2018) period, it is logical to extrapolate to the reference period given that broader migration trends – both nationally and in the State of Michigan – have been stable (or slightly declining) overtime. Similarly, while these studies are national in scope, demographic analysis for the reference time period indicates that out-migration from Michigan was meaningfully and statistically lower than nationally. Accordingly, it is my conclusion that any bias due to temporal or geographic inconsistency is likely to be downward (i.e., that rates of interstate foreclosure migration in Michigan during the 2011-2018 period are even lower).

## References

Crowder, Kyle and Matthew Hall. 2006. "Internal Migration." Pp. 3014-19 in George Ritzer (ed.), *Encyclopedia of Sociology.* Oxford: Blackwell.

Greenwood, Michael J. 1997. "Internal migration in developed countries." *Handbook of Population and Family Economics,* 1: 647-720.

Hall, Matthew, Kyle Crowder, Amy Spring, and Ryan Gabriel. 2018. "Foreclosure Migration and Neighborhood Outcomes: Moving Toward Segregation and Disadvantage." *Social Science Research* 70: 107-14.

Ihrke, David K., and Carol S. Faber. 2012. "Geographical Mobility: 2005 to 2010." Current Population Reports, P20-567. U.S. Census Bureau, Washington, DC.

Ihrke, David K., Carol S. Faber, and William K. Koerber. 2011. "Geographical Mobility: 2008 to 2009." Current Population Reports, P20-565. U.S. Census Bureau, Washington, DC.

Molloy, Raven and Hui Shan. 2013. "The Postforeclosure Experience of U.S. Households," *Real Estate Economics,* 41: 225-54.

U.S. Census Bureau. 2018. "Table A-1. Annual Geographical Mobility Rates, By Type of Movement: 1948-2018" Accessed April 5, 2019 at https://www.census.gov/data/tables/time-series/demo/geographic-mobility/historic.html

White, Michael. J. and David Lindstrom. 2006. "Internal Migration," Pp. 311-46 in Dudley J. Poston and Michael Micklin (eds.), *Handbook of Population,* New York, NY: Springer.

## APPENDIX A

# Matthew Hall
Curriculum Vitae
April 2019

Cornell University                                   Phone: (607) 255-1639
295 Martha Van Rensselaer Hall          Email: mhall@cornell.edu
Ithaca, NY 14853

## Professional Positions

2015 -        Associate Professor of Policy Analysis & Management and Sociology, Cornell University

2012-2015     Assistant Professor of Policy Analysis & Management, Cornell University
2010-2012     Assistant Professor of Sociology and Public Policy, University of Illinois at Chicago

## Education

2010          Ph.D., Sociology and Demography, Pennsylvania State University, State College, PA
2007          M.A., Sociology and Demography, Pennsylvania State University, State College, PA
2004          B.S., Sociology, Western Washington University, Bellingham WA

## Funding

"Left Behind: Deportation, Child Welfare and Foster Care Placement," Principal Investigator (with Frank Edwards); Project 2Gen Pilot Studies Program, 10/2017-10/2018.

"Assessing the Consequences of Temporary Deportation Relief," Co-Principal Investigator (Co-PI Shannon Gleeson); Institute for the Social Sciences ($149,993), 08/2015-08/2018

"Spatial Segregation and Social Networks", Principal Investigator; Stanford Poverty Center; 01/2015-01/2016.

"Racial and Ethnic Diversity in American Communities, 1980-2010," Investigator (PI Barry Lee); National Institutes of Health R01 ($889,984); 09/2013-08/2016.

"The Foreclosure Crisis and Residential Stratification," Principal Investigator; Cornell Center for the Study of Inequality; Cornell Population Center; Cornell Institute for the Social Sciences.

"Exploring the Relationships between Latino Growth, Native Out-Migration, and School Financing: A Pilot Study of School Districts in New York State, 1980-2010," Principal Investigator; Bronfenbrenner Center for Translational Research, Cornell University; 07/2013-09/2014.

"Spatial Dynamics of Housing Discrimination in U.S. Metropolitan Areas, 1989 to 2010," Co- Principal Investigator (PI Jeff Timberlake); National Science Foundation ($150,000); 09/2012 - 09/2013.

"Immigration and Residential Sorting in New Destinations," Principal Investigator; UIC Institute for Research on Race and Public Policy; 06/2011 - 06/2012.

## Peer-Reviewed Articles

Garip, Filiz, Shannon Gleeson, and Matthew Hall. Forthcoming. "How the State Criminalizes Immigrants and to What Effect: A Multi-Disciplinary Account." *American Behavioral Scientist.*

Hall, Matthew, John Iceland, and Youngmin Yi. Forthcoming. "Racial Separation at Home and Work: Segregation in Residential and Workplace Settings." *Population Research and Policy Review*

Hall, Matthew, Kelly Musick, and Youngmin Yi. Forthcoming. "Living Arrangements and Household Complexity among Undocumented Latino Immigrants." *Population and Development Review*

Hall, Matthew, Emily Greenman, and Youngmin Yi. Forthcoming. "Job Mobility among Unauthorized Immigrant Workers." *Social Forces*

Hall, Matthew, Kyle Crowder, Amy Spring, and Ryan Gabriel. 2018. "Foreclosure Migration and Neighborhood Outcomes: Moving Toward Segregation and Disadvantage." *Social Science Research* 70: 107-14.

Taylor, Marylee, Maria Krysan, and Matthew Hall. 2017. "The Uncertain Impact of Anglo/Latino Contact on Anglos' Immigration Policy Views: Awareness of Latinos' Problems is the Key." *Du Bois Review,* 14: 471-95.

Hall, Matthew and Jacob Hibel. 2017. "Latino Student Growth and White Migration from U.S. School Districts, 1980-2010." *Social Problems,* 64: 457-75.

Lee, Barrett, Michael Martin, and Matthew Hall. 2017. "Solamente Mexicanos? Patterns and Sources of Hispanic Diversity in U.S. Metropolitan Areas." *Social Science Research,* 68: 117-31.

York Cornell, Erin and Matthew Hall. 2017. "Neighborhood Problems across the Rural-Urban Continuum: Geographic Trends and Racial and Ethnic Disparities" *The ANNALS of the American Academy of Political and Social Science,* 672: 238-56.

Hall, Matthew and Maria Krysan. 2017. "The Neighborhood Context of Latino Threat." *Sociology of Race and Ethnicity,* 3: 218-35.

Rugh, Jacob and Matthew Hall. 2016. "Deporting the American Dream: Immigration Enforcement and Latino Foreclosures." *Sociological Science.*

Hall, Matthew, Laura Tach, and Barrett Lee. 2016. "Trajectories of Ethnoracial Diversity in American Communities, 1980-2010." *Population and Development Review,* 42: 271-97.

Burkhauser, Richard, Markus Hahn, Matthew Hall, and Nicole Watson. 2016. "Australia Farewell: Predictors of Emigration in the 2000s." *Population Research and Policy Review,* 35: 197-215.

Hall, Matthew, Kyle Crowder, and Amy Spring. 2015. "Neighborhood Foreclosures, Racial/Ethnic Transitions, and Residential Segregation." *American Sociological Review,* 80: 526-49.

Hall, Matthew and Emily Greenman. 2015. "The Occupational Risk of Being Illegal in the United States: Legal Status, Job Hazard, and Compensating Differentials." *International Migration Review* 49: 406-42.

Hall, Matthew, Kyle Crowder, and Amy Spring. 2015. "Variations in Housing Foreclosures across Place and Race, 2005-2012." *The ANNALS of the American Academy of Political and Social Science* 660: 217-37.

Sharp, Gregory and Matthew Hall. 2014. "Emerging Forms of Racial Inequality in Homeownership Exit, 1968-2009" *Social Problems*, 61: 427-47.

Hall, Matthew and Kyle Crowder. 2014. "Native Out-Migration and Neighborhood Immigration in New Destinations." *Demography* 51: 2179-2202.

Hall, Matthew and Jonathan Stringfield. 2014. "Undocumented Migration and the Segregation of Mexican Immigrants in New Destinations." *Social Science Research*, 47: 61-78.

Hibel, Jacob and Matthew Hall. 2014. "Neighborhood Coethnic Immigrant Concentration and Mexican Children's Early Academic Trajectories." *Population Research and Policy Review* 33: 365-91.

Hall, Matthew and Emily Greenman. 2013. "Neighborhood and Housing Quality among Undocumented Immigrants." *Social Science Research* 42: 1712-25.

Hall, Matthew. 2013. "Residential Integration on the New Frontier: Immigrant Segregation in Established and New Destinations." *Demography* 50: 1873-96.

Greenman, Emily and Matthew Hall. 2013. "The Influence of Legal Status on Educational Transitions among Mexican Immigrant Youth: Empirical Patterns and Policy Implications." *Social Forces* 91: 1475-98.

Hall, Matthew and Kyle Crowder. 2011. "Extended-Family Resources and Racial Inequality in the Transition to Homeownership." *Social Science Research* 40: 1534-46.

Hall, Matthew and George Farkas. 2011. "Adolescent Cognitive Skills, Attitudinal/Behavioral Traits, and Career Wages." *Social Forces* 89: 1261-85.

Crowder, Kyle, Matthew Hall, and Stewart Tolnay. 2011. "Neighborhood Immigration and Native Out-Mobility." *American Sociological Review* 76: 25-47.

Hall, Matthew, Emily Greenman and George Farkas. 2010. "Legal Status and Wage Disparities for Mexican Immigrants." *Social Forces* 89: 491-513.

Hall, Matthew and Barrett Lee. 2010. "How Diverse are U.S. Suburbs?" *Urban Studies* 47: 3-28.

Hall, Matthew, Deborah Graefe, and Gordon De Jong. 2010. "Economic Self-Sufficiency of Immigrant Women after TANF Participation: Welfare Eligibility as a Natural Experiment." *Social Science Research* 39: 78-91.

Hall, Matthew. 2009. "Interstate Migration, Spatial Assimilation, and the Incorporation of U.S. Immigrants." *Population, Space, and Place* 15: 57-77.

Hall, Matthew and George Farkas. 2008. "Does Human Capital Raise Earnings for Immigrants in the Low-Skill Labor Market?" *Demography* 45: 619-39.

Graefe, Deborah, Gordon De Jong, Matthew Hall, Samuel Sturgeon, and Julie Van Eerden. 2008. "Immigrants' TANF Eligibility, 1996-2003: What Explains the New Across-State Inequalities?" *International Migration Review* 42: 89-133.


## Book Chapters, Book Reviews, and Encyclopedia Entries

Hall, Matthew. 2017. "Direct Retrospective Self-Report (Cross-Sectional) Method" in Frank D. Bean and Susan K. Brown (eds.) *Encyclopedia of Migration*, Springer.

Hall, Matthew. 2014. Review of *Barrios to Burbs: The Making of the Mexican American Middle Class*, *Contemporary Sociology*

Krysan, Maria, Matthew Hall, and Patrick Washington. 2013. "Immigration Ambivalence in Suburbia: Evidence from Lake County." Public Policy Brief, Chicago Area Study, Institution of Government and Public Affairs, University of Illinois.

Hall, Matthew. 2012. "Lessons Learned from Census 2010 for Illinois Lawmakers." *Illinois Report 2012*. Urbana-Champaign, IL: Institute of Government and Public Affairs, University of Illinois.

Hall, Matthew, Audrey Singer, Gordon De Jong, and Deborah Graefe. 2011. "The Geography of Immigrant Skills: Educational Inequality across Metropolitan Destinations." *State of Metropolitan America*. Washington, DC: Brookings Institution.

Hall, Matthew and Darren Lubotsky. 2011. "The Demography of the Immigrant Population in Illinois." *Policy Forum*, Institute of Government and Public Affairs, University of Illinois.

Hall, Matthew and Anna R. Soli. 2010. "The Bumpy Road Ahead for Hispanic Families." In Nancy Landale, Susan McHale, and Alan Booth (eds.), *Growing up Hispanic: Health and Development of Children of Immigrants*. Washington, DC: Urban Institute.

Lee, Barrett and Matthew Hall. 2009. "Residential Mobility." Pp. 371-77 in Deborah Carr (ed.) *Encyclopedia of the Life Course and Human Development, Vol. 2: Adulthood*. Detroit: Macmillan.

Crowder, Kyle and Matthew Hall. 2006. "Internal Migration." Pp. 3014-19 in George Ritzer (ed.), *Encyclopedia of Sociology*. Oxford: Blackwell.

Teachman, Jay, Lucky Tedrow, and Matthew Hall. 2005. "Future Demographic Trends in Divorce." Pp. 59-82 in Mark Fine and John Harvey (eds.), *Handbook of Divorce and Relationship Dissolution.* New York: Lawrence Erlbaum.

## Working Papers

Branigan, Amelia and Matthew Hall. "Colorism in the Rental Housing Market: Field Experimental Evidence of Discrimination by Skin Color." *Under Review at American Journal of Sociology*

Potochnick, Stephanie and Matthew Hall. "Moving up or falling behind? Occupational mobility of children of immigrants based on their parents' origin country occupation." *Revise & Resubmit at Demography*

Garip, Filiz, Shannon Gleeson, and Matthew Hall (editors). *Criminalizing Immigrants*, Special Issue of *American Behavioral Scientist*.

Hall, Matthew, Jeffrey Timberlake, and Alex Currit. "The Spatial Dynamics of Racial Discrimination: Local Racial Contexts and Disparate Treatment in Housing Search."

Hall, Matthew, Alex Currit, and Jeffrey Timberlake. "Racial Steering in American Housing Markets"

Hall, Matthew and Jacob Rugh. "Local Immigration Enforcement and Latino Segregation."

Mateyka, Peter and Matthew Hall. "Neighborhood Racial Context and Residential Mobility: A Comparison of Two Longitudinal Surveys."

Alvarado, Steven, Matthew Hall, and Alex Currit. "Temporary Legal Status and High School Dropout: Evidence from Salvadoran Child Migrants."

**Other Publications and Reports**

Hall, Matthew, Mark Ellis, Christian Hess, and Maria Vignau Loria. 2018. "Estimates of Seattle's Population At-Risk of Changes to Public Charge." Center for Studies in Demography & Ecology.

Hall, Matthew. 2011. "Understanding the Geography of Immigrant Skills." *Huffington Post*, June 10.

Hall, Matthew. 2011. "Population Change during Trying Times: Illinois' New Demographic Reality." Institute of Government and Public Affairs, University of Illinois.

Hall, Matthew. 2010. "Racial integration rising in Chicago." *Chicago Sun-Times*, December 20.

Iceland, John, Gregory Sharp, Luis Sanchez, Matthew Hall, and Kris Marsh. 2010. "Racial and Ethnic Residential Segregation in the United States: Comparisons Across Racial and Ethnic Groups, 1970-2009." Changing American Neighborhoods and Communities Report Series, Penn State.

Iceland, John, Matthew Hall, Gregory Sharp, Luis Sanchez, and Kris Marsh. 2010. "Racial and Ethnic Residential Segregation in the New York Metropolitan Area, 1970-2009." Changing American Neighborhoods and Communities Report Series, Penn State

Hall, Matthew, John Iceland, Gregory Sharp, Luis Sanchez, and Kris Marsh. 2010. "Racial and Ethnic Residential Segregation in the Chicago Metropolitan Area, 1980-2009." Changing American Neighborhoods and Communities Report Series, Penn State.

Hall, Matthew, John Iceland, Gregory Sharp, Luis Sanchez, and Kris Marsh. 2010. "Racial and Ethnic Residential Segregation in the United States: Residential Patterns of Asians, 1980-2009." Changing American Neighborhoods and Communities Report Series, Penn State.

Sanchez, Luis, John Iceland, Gregory Sharp, Matthew Hall, and Kris Marsh. 2010. "Racial and Ethnic Residential Segregation in the United States: Residential Patterns of Latinos/Hispanics, 1980-2009." Changing American Neighborhoods and Communities Report Series, Penn State.

Marsh, Kris, John Iceland, Gregory Sharp, Luis Sanchez, and Matthew Hall. 2010. "Racial and Ethnic Residential Segregation in the United States: Residential Patterns of Blacks, 1970-2009." Changing American Neighborhoods and Communities Report Series, Penn State.

Sharp, Gregory, John Iceland, Luis Sanchez, Matthew Hall, and Kris Marsh. 2010. "Racial and Ethnic Residential Segregation in the United States: Residential Patterns of Whites, 1970-2009."

Changing American Neighborhoods and Communities Report Series, Penn State.

## Honors and Awards

| | |
|---|---|
| 2016 | Early Career Award, Penn State Alumni Association. |
| 2015- | Theme Project Co-Leader, Institute for the Social Sciences, Cornell University |
| 2015 - | Fellow, Stanford Center on Poverty & Inequality, Stanford University |
| 2015 | Visiting Scholar, Summer at Census, US Census Bureau |
| 2014- | HUD Multi-Disciplinary Research Team, US Dept of Housing and Urban Development |
| 2011-2012 | Faculty Scholar, Institute for Research on Race and Public Policy, UIC |
| 2010 | Distinguished Dissertation Award, Alumni Association, Penn State |
| 2009 | Best Published Student Paper, Department of Sociology, Penn State |
| 2007-2009 | Joan Huber and William Form Graduate Fellowship, Penn State |
| 2007 | Sociology Alumni Scholarship, Penn State |
| 2004 | Outstanding Graduate in Sociology, Western Washington University |
| 2003 | Demography Scholarship, Western Washington University |

## Participation at Professional Meetings and Invited Talks

"Immigrant Deportations and Latino Segregation"
- Annual Meeting of the American Sociological Association (August 2019)
- Annual Meeting of the Population Association of America (April 2019)
- Population and Public Policy Conference, University of New Mexico (Feb 2019)
- Department of Sociology, University of Washington (Feb 2019)
- Migration Working Group, Center for Studies in Demography & Ecology (Dec 2018)
- Center for Wealth and Inequality, Columbia University (Nov 2018)
- Fall Meeting of the Association for Public Policy Analysis and Management (Nov 2018)
- Max Planck Institute for Demographic Research, Rostock, Germany (Oct 2018)

"Liminal Legality and Education: Evidence from Salvadoran Child Migrants"
- Department of Sociology, University at Buffalo (May 2018)
- Population Research Institute, Penn State (March 2018)
- Annual Meeting of the Eastern Sociological Society (February 2018)
- Center for Demography and Ecology, University of Wisconsin-Madison (January 2018).
- Department of Sociology, University of Colorado-Boulder (December 2017)
- Annual Meeting of the Population Association of America (April 2017)
- Cornell Population Center, Cornell University (April 2017)
- Center for the Study of Inequality, Cornell University (March 2017)

"Moving Up or Falling Behind? Occupational Mobility of Children of Immigrants Based on Their Parents' Home Country Occupation"
- Fall Meeting of the Association for Public Policy Analysis and Management (Nov 2017).

"Latino Migration and School District-Level Trends in Private and Charter School Enrollments"
- Fall Meeting of the Association for Public Policy Analysis and Management (Nov 2017).
- Annual Meeting of the Population Association of American (April 2015).

"Legal Status and the Family Formation Experiences of Young Mexican Immigrants"
- Annual Meeting of the Population Association of America (April 2017).

"Neighborhood Racial Context and Residential Mobility: A Comparison of Two Longitudinal Surveys"

- Annual Meeting of the Population Association of America (April 2017).

"Deporting the American Dream: Immigration Enforcement and Latino Foreclosures,"
- Center for Population and Development Studies, Harvard University (November 2016).
- Office of Population Research, Princeton University (October 2016).
- Annual Meeting of the American Sociological Association (August 2016).

"The Spatial Dynamics of Racial Discrimination: Local Racial Contexts and Disparate Treatment in Housing Search"
- Department of City & Regional Planning, Cornell University (April 2016).
- Annual Meeting of the Population Association of America (April 2016).

"Job Mobility among Unauthorized Workers"
- Center for the Study of Inequality, Cornell University (April 2016).
- Annual Meeting of the Population Association of America (April 2016).
- Department of Sociology, McGill University (March 2016).
- Fall Meeting of Association of the Public Policy Analysis and Management (Nov 2015).

"Housing Foreclosure, Neighborhood Migration, and Racial/Ethnicity Inequality"
- Fall Meeting of Association of the Public Policy Analysis and Management (Nov 2015).

"Racial Segregation at Work and Home"
- Annual Meeting of the American Sociological Association (August 2015).
- US Census Bureau, Washington DC (June 2015).

"Trajectories of Ethnoracial Diversity in American Communities, 1980-2010."
- Annual Meeting of the Population Association of American (April 2015).

"Hispanic Diversity in Metropolitan Areas"
- Annual Meeting of the Urban Affairs Association (April 2015).

"Neighborhood Foreclosures, Racial Transitions, and Residential Segregation"
- Fall Meeting of the Association of Public Policy Analysis and Management (Nov 2014).
- Residential Inequality Conference, Penn State (September 2014).
- Annual Meeting of the American Sociological Association (August 2014).
- Department of Sociology, Texas A&M University (April 2014).
- Center for the Study of Inequality, Cornell University (January 2014).
- Population Research Institute, Penn State (November 2013)

"Latino Youth Growth and White Out-Migration from Newly-Emerged Latino School Districts"
- Bronfenbrenner Center for Translational Research, Cornell University (October 2014).
- Annual Meeting of the Population Association of America (April 2014).

"The Neighborhood Context of Latino Threat."
- Annual Meeting of the American Sociological Association (August 2014).
- Fall Meeting of the Association of Public Policy Analysis and Management (Nov 2012).

"Spatial and Temporal Dimensions of Foreclosure Diffusion during the Great Recession."
- Annual Meeting of the Population Association of America (April 2014).

"Native Flight from Immigrants in Established, New, and Developing Gateways."
- Center for Poverty Research, University of California - Davis (March 2014).
- Department of Development Sociology, Cornell University (November 2013).
- Department of Sociology, University of Cincinnati (March 2013).
- Institute for Research on Race and Public Policy, UIC (February 2012).
- Annual Meeting of the Pacific Sociological Association (March 2011).
- Annual Meeting of the Population Association of America (April 2010).

"The Occupational Risk of Being Illegal: Legal Status and Job Hazard among Mexican and Central American Immigrants."
- Center for Studies in Demography and Ecology, University of Washington (May 2015)
- Annual Meeting of the Population Association of America, New Orleans (April 2013).

"Racial Differences in Downward Housing Mobility in America"
- Annual Meeting of the Population Association of America (April 2013).
- Annual Meeting of the Population Association of America (April 2012).
- Annual Meeting of the Urban Affairs Association (April 2012).

"Residential Integration on the New Frontier: Immigrant Segregation in Established, Emerging, and Nongateway Destinations."
- Annual Meeting of the Population Association of America (April 2012).

"Legal Status and the Segregation of Mexican in New Destinations"
- Institute for Government and Public Affairs, University of Illinois (March 2012).

"Enclave Effect or Selection Effect? Early Academic Performance of Mexican Children in Enclave Neighborhoods."
- Annual Meeting of the Population Association of America (April 2011).
- Annual Meeting of the American Sociological Association, (August 2010).

"Labor Market Impacts of High Skill Immigrants in Rustbelt Cities."
- Fall Meeting of the Association of Public Policy Analysis and Management (Nov 2010).

"The Influence of Legal Status on Educational Transitions among Mexican Immigrant Youth: Empirical Patterns and Policy Implications."
- Annual Meeting of the Population Association of America (April 2010).
- National Poverty Center, University of Michigan (April 2010).

"Legal Status and Wage Disparities for Mexican Immigrants."
- Annual Meeting of the Population Association of America (April 2010).
- Annual Meeting of the American Sociological Association (August 2009).

"State Immigration Legislation Policy: Immigrant Reception Climate and Access to Public Benefits and Services."
- Fall Meeting of the Association of Public Policy Analysis and Management (Nov 2009).

"Immigrant and Native Mobility: Implications for Community Change and Emerging Patterns of Segregation."
- Annual Meeting of the American Sociological Association, (August 2009).

"Race, Accessible Wealth, and the Transition to Homeownership."
- Annual Meeting of the Population Association of America (May 2009).
- Annual Meeting of the American Sociological Association, Boston (August 2008).

"Immigrant Population Change and Skill Profiles in 21st Century Gateways: A Human Capital-Based Typology of Metropolitan Destinations, 2000-2007."
- Annual Meeting of the Population Association of America (May 2009).
- Fall Meeting of the Association of Public Policy Analysis and Management (Nov 2009)

"Geographic Diffusion of the Foreign Born and the Shifting Scale of Spatial Assimilation."
- Annual Meeting of the Population Association of America (May 2008).
- Annual Meeting of the American Sociological Association (August 2007).

"Are All Suburbs Really Made of Ticky-Tacky? Homogeneity and Diversity in Suburbia."
- Annual Meeting of the American Sociological Association (August 2008).

"Assimilation or Segmentation? Immigrant and Native Male Earnings Trajectories in the Low-Skill Labor Market."
- Annual Meeting of the Population Association of America (May 2008).

"Immigrants' TANF Eligibility, 1996-2003: What Explains the New Across-State Inequalities?"
- Fall Meeting of the Association of Public Policy Analysis and Management (Nov 2006)

"Promoting or Punishing Traditional Family Formation? How and Why States Vary in Post-Welfare Reform Rules Stringency."
- Fall Meeting of the Association of Public Policy Analysis and Management (Nov 2006)

**Invited Presentations for Policymakers and Practitioners**

"Closing the Golden Door: Legal Status & Immigrant Criminalization in the Trump Era"
- Keynote for *Migration and Migrants in Terrifying Times*, University of Minnesota (Dec 2018)
- Cornell Institute for Public Affairs, Ithaca (May 2019)

"Immigration Upstate: Unauthorized Migration, Deportations, and Child Well-Being"
- Program for Research on Youth Development & Engagement, Ithaca (May 2018)

"DACA: Policy, Community, and Global Implications"
- Webinar for Association of Public Policy Analysis and Management (May 2018)

"Immigration to New York: Demographic Trends and Policy Concerns"
- Building Sustainable Communities: Global Forces, Local Focus, CaRDI Community Development Institute, Ithaca (September 2017).

"Executive Order on Border Security and Immigration Enforcement Improvements."
- Panelist for the Cornell Latin America Student Society (February 2017)
- Panelist and Moderator for Cornell Institute for Public Affairs (February 2017)

"A Changing City: Seattle Neighborhood Change"
- Panelist at American Sociological Association, Seattle WA (August 2016).

"Using SIPP Data at the Research Data Center"

- Texas Research Data Center, Texas A&M University (April 2014).

"Immigrant Settlement Patterns"
- National Academy of Sciences Panel Meeting on Economic and Fiscal Consequences of Immigration, Washington DC (April 2014).

"Illinois' New Demographic Reality: Census 2010 and Local Policymaking"
- United Counties Council of Illinois, Springfield (October 2011).
- LEAD Illinois, Urbana (September 2011).

"Changing Demography, Persistent Segregation: Race & Residential Stratification in Chicago."
- Chicago Fair Housing Alliance, Chicago (May 2011).

## Teaching Experience

Applied Econometrics (PAM 5100), Cornell University
Demography of Immigration (SOC 490), University of Illinois, Chicago
Demography Training Seminar (PAM 6810), Cornell University
Linear Models (SOC 6020), Cornell University
Graduate Social Statistics (SOC 401), University of Illinois, Chicago
Immigration and Public Policy (PAM/SOC 3040), Cornell University
Immigrant Incorporation (PAM/SOC 6140), Cornell University
Introduction to Social Statistics (SOC 201), University of Illinois, Chicago
Population Controversies in Europe (PAM 3620), Cornell University
Race and Ethnic Relations (SOC 119), Penn State University
Statistics for Policy Analysis & Management Majors (PAM 2101), Cornell University

## Intramural Service

*University of Washington*
2018 - 2019   Science Core Director, Center for Studies in Demography & Ecology
2018 - 2019   Seminar Series Organizer, Center for Studies in Demography & Ecology

*Cornell University*
2016-          Core Faculty, Cornell Institute of Public Affairs (MPA Program)
2016 - 2018   Training Director, Cornell Population Center
2016 -         President's Committee for Undocumented/DACA Students
2016 - 2018   Director of Graduate Studies, Field of Demography
2016 - 2018   Faculty Advisory Board for Information Technology, College of Human Ecology
2017 - 2018   Executive Committee, Dept. of PAM
2017 - 2018   Rhodes Postdoc Search Committee (Chair), Cornell Population Center
2017 - 2018   eMPA Steering Committee, Cornell Institute for Public Affairs
2017 - 2018   PAM Chair Search Committee, College of Human Ecology
2016 - 2017   Immigration Conference Planning Committee, Center for Study of Inequality
2016 - 2017   Executive Committee on CIPA-PAM Integration, College of Human Ecology
2014 - 2017   Mann Library University Committee (Elected), College of Human Ecology
2016          *Educate the Vote* Planning Committee, College of Human Ecology
2014 - 2016   Demography Faculty Search Committee, Dept. of PAM
2015 - 2016   Sociology Faculty Search Committee, Dept. of Sociology
2013 - 2014   GIS Faculty Search Committee, Dept. of Development Sociology

*University of Illinois at Chicago*

2011 - 2012   Advisory Committee (Elected), Institute of Government and Public Affairs
2011 - 2012   Advisory Committee (Elected), Department of Sociology
2011 - 2012   Assistant Professor Recruitment Committee, Department of Sociology
2010 - 2012   Graduate Statistics Curriculum Committee, Department of Sociology
2010 - 2011   Undergraduate Program Committee, Department of Sociology

*Pennsylvania State University*

2008 - 2010   Statistics Advisory Board, Population Research Institute
2007 - 2009   Graduate Concerns Committee, Department of Sociology
2008 - 2009   Colloquium Committee, Department of Sociology
2006 - 2009   Summer Methodology Workshop Committee, Population Research Institute
2006 - 2007   Undergraduate Program Committee, Department of Sociology

**Professional Service**

2017 -         Associate Editor, *International Migration Review*
2016 -         Editorial Board, *Demography*
2018 -             APPAM Mentor Program
2019 -             PAA Mentor Program
2018 -               Robert Park Book Committee, ASA Community and Urban Sociology Section
2013 - 2016  Otis Dudley Duncan Book Committee (Chair 2015), ASA Population Section

Conference Discussant or Organizer
- American Sociological Association (2012, 2015, 2016)
- Association of Public Policy Analysis & Management (2015, 2018)
- Population Association of America (2013, 2014, 2015, 2016, 2017, 2018, 2019)

Occasional reviewer: *American Journal of Sociology; American Sociological Review; American Journal of Industrial Medicine; Annals of the Association of American Geographers; City & Community; Contemporary Sociology; Demography; Demographic Research; Economic Inquiry; Housing Policy Debate; International Migration Review; Journal of Family Issues; Journal of Health Economics; Journal of Health and Social Behavior; Journal of International Migration and Integration; Journal of Maps; Journal of Urban Affairs; Pew Charitable Trust; Population Research and Policy Review; Population, Space, and Place; Research in Social Stratification and Mobility; Research on Economic Inequality; Routledge Press; Russell Sage Foundation; Social Currents; Social Forces; Social Problems; Social Science Quarterly; Social Science Research; Sociological Forum; Sociology of Race and Ethnicity; The Sociological Quarterly; Urban Geography; Work and Occupations*

Research or commentary covered by: *New York Times; Washington Post; Wall Street Journal; This Week with Christiane Amanpour; CBS; NPR; CSPAN; Vox; Fox News; Slate; Chicago Tribune; Chicago Sun-Times; Houston Chronicle; Daily Mail; The Atlantic; Salt Lake Tribune; Albany Times Union; Standard-Examiner; Tulsa World; Buffalo News; Cleveland Plain Dealer; Dayton Capital Times; Arizona Republic; Washington Independent; Las Vegas Sun; Pittsburgh Tribune-Review; Bay Citizen; St. Louis Post-Dispatch; Minneapolis Star Tribune; Rochester Democrat and Chronicle; CityLab*

**Professional Memberships**

American Sociological Association
Association for Public Policy Analysis and Management
Population Association of America

# EXHIBIT D

DECISION BELOW: 879 F.3d 1216

LOWER COURT CASE NUMBER: 16-1330

QUESTION PRESENTED:

Congress passed the Fair Debt Collection Practices Act (FDCPA) to "eliminate abusive debt collection practices by debt collectors." 15 U.S.C. 1692(e). Under the FDCPA, the term "debt collector" is defined as "any person***who regularly collects or attempts to collect, directly or indirectly, debts owed or due***another." 15 U.S.C. 1692a(6).

This case presents a clear and entrenched conflict regarding whether the FDCPA applies in the foreclosure context. In the decision below, the Tenth Circuit, siding with the Ninth Circuit, held that non-judicial foreclosures are not covered by the FDCPA; in doing so, the panel acknowledged the issue has "divided the circuits," and it expressly rejected the "contrary position" of multiple courts of appeals and state high courts. This holding was the sole basis of the decision below, and it arises on the precise fact-pattern that has generated extensive "confusion" and hundreds of conflicting decisions. This case is the perfect vehicle for resolving the widespread disagreement over this important issue.

The question presented is:

Whether the FDCPA applies to non-judicial foreclosure proceedings.

CERT. GRANTED 6/28/2018